EDWARD H. BARTLETT and others, Vestry of ST.
MATTHEW'S PARISH, Oakland *vs.* THE REV. FRED-
ERICK S. HIPKINS.

*Protestant Episcopal Church—Choosing a Rector—Powers
of Vestries—Termination of Contract—Act of 1798, ch. 24
—Incorporation of Vestry.*

The canon of the Protestant Episcopal Church (Canon 4, Title II)
which provides that in case of any disagreement between a
Rector and the vestry in regard to the dissolution of his pastoral
relation, either party may give notice of such disagreement to
the Bishop, and that his decision in the premises shall be final
and binding upon the parties, and which declares by its fourth
section that the Canon shall not be in force in any diocese with
whose laws or charters it may interfere, is not in force in the
diocese of Maryland, being in conflict with the Act of Assembly
of 1798. ch. 24, incorporating the vestries of the Protestant Epis-
copal Church, and vesting them with full power and authority,
from time to time, to choose ministers to officiate in any Church
or Chapel belonging to the parish, for such time as the said
vestry may think proper, and to agree and contract with such
ministers for their salary, &c.

Where there was a vacancy in a parish, and the vestry by resolu-
tion tendered to H. the rectorship of the parish, and agreed at
the same time to pay him $700 a year, and this call, and the
terms upon which it was offered were accepted, and the call and
agreement were both recorded among the proceedings of the
vestry, such resolution, notwithstanding it did not designate a
definite time for which H. was chosen rector, was not only a
substantial, but a literal compliance with the Act of 1798, ch.
24.

Where the Convention of the Diocese has constituted a parish,
and the parishioners have elected a vestry, in accordance with
the provisions of the Act of 1798, ch. 24, such vestry, *ipso facto*,
becomes a corporate body.

Bartlett, *et al.* *vs.* Hipkins.

APPEAL from the Circuit Court for Garrett County, in Equity.

This appeal was taken from the order of the lower Court overruling the motion to dissolve the injunction previously granted, and making said injunction permanent. The opinion of this Court, together with the separate opinion of Chief Judge ALVEY, furnish a full statement of the case.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, IRVING, MCSHERRY, and BRISCOE, J.

*Henry E. Davis,* and *William Pinkney Whyte,* (with whom were *James W. Thomas,* and *Henry Wise Garnett,* on the brief,) for the appellants.

The solution of the question at issue, is dependent upon the Maryland vestry law—the Act of 1798, ch. 24.—Under that law the vestry may choose a minister for such time as it may think proper, and may agree with him as to salary on such terms and conditions as it may think reasonable and proper; and upon the expiration of the contract the vestry may renew it, but if not renewed the vestry's choice and contract shall remain until it declares its desire to make a new choice or contract.

The vestry in this case called—that is, chose—the appellee as rector, and promised him $700 a year. This was on the 3rd of December, 1887. Nothing was said in the vestry's resolution about canons or laws. Of course, it was acting under the vestry law, and that only. The appellee accepted the vestry's invitation and became rector.

It is simply a question of civil law what this action on the part of the vestry and the appellee means. The reciprocal action of the vestry and the appellee constituted a

contract between them of indefinite employment and service. And such a contract is terminable at the will of either party, or, at the least, upon reasonable notice.

An agreement to pay for future services at the rate of a certain sum per year is not of itself a hiring for a year or any definite time. *Prentiss vs. Ledyard,* 28 *Wis.,* 131.

By the terms of a contract between plaintiff and defendant, plaintiff, in consideration of a certain sum for the year 1873, and of another sum for 1874, to be paid in semimonthly or monthly instalments, agreed to devote his whole time and attention solely to the business of the defendant. Under the contract, plaintiff entered the service of the defendant and continued it up to June, 1873, when the defendant suspended business. It was held, that the plaintiff could not recover of the defendant. *Orr vs. Ward,* 73 *Ill.,* 318.

By a written contract reciting that B. intended to carry on a certain business, and wished to secure the services of A., A. agreed to give "during the term of not exceeding three years from the date" of the instrument, his exclusive time and skill to the business, and not to be connected "during the continuance of this agreement" with any other person in such business; and B. agreed "during the said term to pay" A. "$30 per week as compensation for his services so rendered." In an action by A. against B. for wrongfully discharging him before the expiration of three years, it was held that B. could terminate the contract at any time by giving reasonable notice. *Harper vs. Hassard,* 113 *Mass.,* 187.

"There can be no doubt that, in this country, the rule is, an indefinite hiring is *prima facie* a hiring at will. It is also well settled that a hiring at so much a week, month, or year, no time being specified, does not, of itself, make more than an indefinite hiring." *McCullough Iron Co. vs. Carpenter,* 67 *Md.,* 557.

In this case it was held that the employment of an assistant manager at $1,000 per year was indefinite, and so at will. And see, to the same effect, *Coffin vs. Landis,* 46 *Pa. St.,* 426; *Peacock vs. Chambers,* 46 *Penn. St.,* 434; *De Briar vs. Minturn,* 1 *Cal.,* 450; *Blaisdell vs. Lewis,* 32 *Me.,* 515.

The result is, that the contract of employment between the appellants and the appellee, being for an indefinite period, and so an employment at will, was terminable at the pleasure of either party. On the 13th of September, 1890, the appellants requested of the appellee his resignation, to take effect the 1st of January, 1891. The appellee declined to resign, and thereupon the appellants notified him that they would consider his rectorship as terminated on the 1st of January, 1891. Clearly, this ended the appellee's contract relations with the appellants; and, accordingly ended his rights as rector.

The Court below thought otherwise; and cited in support of its view the cases of *Avery · vs. Inhabitants of Tyringham,* 3 *Mass.,* 160; *Sheldon vs. Congregational Parish of Easton,* 24 *Pick.,* 286, and *Youngs vs. Ransom,* 31 *Barb.,* 58. Of these the first two are cases of Congregational ministers, the last a case of a Protestant Episcopal rector.

In *Avery vs. Tyringham,* PARKER, C. J., said (p. 177); "*It is a general rule that an office is holden at the will of either party,* unless a different tenure be expressed in the appointment, *or is implied by the nature of the office, or results from ancient usage.*" The Court, considering the nature of the office of a Congregational minister, the *constitution,* laws and usages of Massachusetts as to the settlement of such, concluded that an agreement involved in the settlement was not at will. The case in *Pickering* is similar.

The short answer to these cases is, that Maryland has no laws or usages from which a similar conclusion could

Bartlett, *et al. vs.* Hipkins.

be deduced. On the contrary, her ecclesiastical history clearly shows a hostility to the notion that such a contract is to last for the life-time of a clergyman. The history of Canon 4, of Title II, puts this beyond doubt. And, besides, the very law under which the contract between the parties hereto was made, was conceived in the purpose of putting an end to life-tenures of the clergy, and the church establishment, and of throwing the whole matter of the incumbency of rectors upon the law of civil contract.

The case of *Youngs vs. Ransom* is not in point. In that case, the diocese of which the rector's parish formed part was subject to Canon 4, Title II, and the Court relied upon this Canon. Says the Court (pp. 58-'9) : "When a minister is called or settled in an Episcopal parish without any such limitation, he can only be dismissed, or sever the connection, by mutual consent, or by superior ecclesiastical authority, on the application of one of the parties. *The* 33d *Canon of the General Convention of* 1832 [Canon 4, Title II] *is very explicit to this effect.*"

This case is instructive on one point : The Court says in so many words, "The ecclesiastical law of the mother country is no part of the law under which we live." p. 60.

There are similar cases, not cited by the Court. Thus, in *Batterson vs. Thompson*, 8 *Phil.*, 251, (the "*St. Clement's Church Case*"), the Court says : "The charter being granted, the rector and his parishioners, together with the vestry, held rights under and by virtue of that fundamental law, which *in terms* 'adopts the constitution, canons, doctrine, discipline, and worship of the Protestant Episcopal Church' in this diocese and *in the United States,* and *acknowledges their authority.*"

In *Lynd vs. Menzies, et al.*, 33 *N. J. L.*, 162, there was a dedication of a lot for a church, "to be consecrated,

appropriated and devoted forever, exclusively to the service of Almighty God, according to the doctrine, discipline and worship of the Protestant Episcopal Church in the United States of America," and the canon was applied.

In *Bird vs. St. Mark's Church of Waterloo*, 62 *Iowa*, 567, the Court relies expressly upon the fact that the church by its articles of incorporation, &c., subjected itself to the General Convention and its canons, saying that by reason of such subjection "these canons became just as much a part of the contract of employment as if they had been specifically referred to, or written out in full therein." (p. 572-'3.) No case can be found militating or appearing to militate against the position taken, in behalf of the appellants, under the law of Maryland; and every case supposed so to militate will be found to have arisen where the canon is in conceded operation, and to turn upon the canon.

*Edward N. Rich*, and *Charles Handfield Wyatt*, for the appellee.

This case involves no dispute as to facts, nor any conflict between the civil law and the ecclesiastical law, to which both parties, as members of the same religious organization, are equally subject.

Under the ecclesiastical law of England, as to the Church of England, to which the Protestant Episcopal Church is the successor in this country (1798, *ch.* 24, *sec.* 9), the incumbent *held a life tenure de bene esse*, and together with the wardens formed the corporation; and the vestry was composed of all the contributing parishioners. This law, in so far as not varied by statute, or the changed circumstances of the country, or the laws, customs, usages and discipline of the Protestant Episcopal Church, is, if not the law of the Church, at least the basis of that law, (*Lynd vs. Menzies*, 33 *N. J. L.*,

162,) to which we must look in interpreting the existing law.   In 1692, when the Crown had seized into its own hands the government of the Province of Maryland, a law was passed directing the County Justices to lay out each county into parishes, and the freeholders in each parish were to choose the vestrymen, who were to levy rates, &c., but no change in the tenure was made.   To this law there were some supplements, and in the course of a few years the State was divided into probably thirty-one parishes.   In 1702 the former Acts were repealed and a new one passed, establishing what was called a select vestry of six, who, with the incumbent, had like powers, but the tenure was not changed.

This life-tenure was fully recognized by the Act of the Provincial General Assembly of Maryland, passed May 1st, 1744, ch. III, entitled "An Act to divide St. Stephen's, *alias* North Sassafras parish, in Cecil County," in which, after dividing that parish into two, it provides that the Rev. Hugh Jones, the then incumbent, shall continue the incumbent of *both* parishes *during his life.*

This law continued until 1779, when a new law was passed for the establishment of select vestries, and in this law for the first time appeared any grant of power to the vestry to call a rector, which grant of power originated probably in the exigencies of the time of the Revolution.   This law continued until 1798, ch. 24, commonly known as the Vestry Act.   By sec. 15 of that Act, the vestry have granted to them a power which they may exercise if they please, to limit the tenure of the rector, but it can only be exercised *in the one way set forth,* by direct contract or agreement with the rector, and such agreement or contract must be entered in their proceedings; in the absence of the exercise of such power, the tenure of the rector must remain a life-tenure so far as the civil law in Maryland affects it.

This was not only the case in Maryland, but in most of the other States.   Such tenure and pastoral connec-

tion might of course be terminated by the mutual agreement of the parties, as it had been formed by such agreement, but the church recognized the fact that circumstances might arise under which it might be desirable to terminate the relationship, even though one party might be unwilling to agree to it.

As early as 1808 the Church enacted a Canon on this subject, and its provisions, with modifications, from time to time, have continued, and are embodied in Canon 4, Title II. This Canon provides for this case more fully and more satisfactorily than possibly could be done by the civil law. It recognizes the fact that the pastoral relation exists not only between the *rector* and the *vestry*, but more especially between the *rector and his parishioners*, and that the *vestry* acts as *such*, only when authorized to act in the premises. By this Canon a tribunal is established, comprised of the Bishop and his Standing Committee, who are fully empowered to hear the whole matter, and their decision is final and absolute.

This tribunal being composed of the Bishop and the Standing Committee, who in this diocese consist of eight presbyters, elected annually by the Convention—members who are supposed to be those most to be trusted with the ecclesiastical affairs of the diocese—is the one than which none could be more fit to consider and decide such questions. It is one before which not only the *rector and vestry* may appear, but *also any of the parishioners,* so that the full facts of the case may be understood, and *no man* can *be dismissed* from his "office" without charges being made, and opportunity given him to meet and refute the same.

This Canon provides in its last section that it shall not be in force in any diocese which has made, or shall hereafter make, provision by Canon on this subject. The diocese of Maryland has no Canon on this subject.

It also provides that it shall not be in force in any diocese with whose *laws* or *charters* it may interfere.

There is nothing in the organization or charter of St. Matthew's parish with which it interferes. Nor is it in conflict with the civil law of Maryland; for it is shown that under that, there is only one way in which the vestry may limit the tenure of the rector, viz., by express agreement and contract with him, entered among the proceedings; if such agreement exists, and the pastoral relation is terminated by it, then the case does not come under this Canon, which provides in the first section: "nor may such rector or minister be removed therefrom by said parish or vestry against his will;" if he have *agreed* to a limitation of the tenure, the ending of it cannot be *against his will.*

A rector is not a mere hireling. He is elected to an office. He does not agree to serve for a year or for any specified time, but until the pastoral relation is terminated by mutual consent, or the intervention of the ecclesiastical authority. In *Avery vs. Inhabitants of Tyringham,* 3 *Mass.,* 170, it is said: "I cannot, therefore, entertain a doubt that a contract made between a minister and his people, in terms like the one before us, continues for the life of the minister."

"Before and since the Revolution this question has been considered by the Courts of Law, * * and it has been the uniform opinion of all the Judges who have successively filled the bench of our highest Judicial Courts, that when no tenure was annexed to the office of a minister, by the terms of settlement, he did not hold the office at will, but for life, determinable for some good and sufficient cause, or by the consent of both parties. " (p. 178.) See *Youngs vs. Ransom,* 31 *Barbour,* 58; *Lynd vs. Menzies,* 33 *New Jersey Law,* 162; *Sheldon vs. Cong. Parish of Easton,* 24 *Pick.,* 281; *Batterson vs. Thompson,* 8 *Phila.,* 251, (the *St. Clement's Church Case*); *Perry vs. Wheeler,* 12 *Bush,* 541; *Webber vs. Zimmerman,* 22 *Md.,* 156–170.

The appellants have undertaken to construe this "call" to be for one year, and that it continued from year to year until terminated by their resolution of the 15th of November, 1890. Undoubtedly under sec. 15 of the Vestry Act they might have made such a call, and if agreed to by Mr. H., and entered among their proceedings, it would have been the law of the case. But they did not do so; the call is indefinite as to time, and with one restriction alone, that the salary should be seven hundred dollars per annum, &c. Even were the call a mere hiring, and not an election to office, in *McCullough vs. Carpenter,* 67 *Md.,* 557, this Court has decided "There can be no doubt that in this country the rule is, an indefinite hiring is *prima facie* a hiring *at will.* It is also well settled that a hiring at so much a week, month or year, no time being specified, does not make more than an indefinite hiring. It is competent for the parties to show what the mutual understanding was, but unless there was a mutual understanding it is only an indefinite hiring."

Under this decision the stipulation as to salary did not make the call one for one year. The nature of the case, the relationship established, and the intimate, responsible and solemn duties undertaken, render it unreasonable to suppose that the call to the office was offered or accepted as a call at will. *Youngs vs. Ransom,* and *Avery vs. Inhabitants of Tyringham, supra.*

Before the civil law, religious organizations are merely voluntary associations, and members uniting themselves to such organizations impliedly consent to and are bound to obey the laws which they thus make for themselves; and the decisions of the tribunals established by such bodies concerning any question of doctrine, *discipline* or worship, are final, when properly rendered, and the civil Courts will not undertake to review such decision. *German Reformed Church vs. Seibert,* 3 *Barr,* 282–291;

*Watson vs. Jones,* 13 *Wallace,* 727; *Perry vs. Wheeler,* 12 *Bush,* 541; *Tartar, et al. vs. Gibbs, et al.,* 24 *Md.,* 323, 338 and 339.

What is the status of the appellants—are they a *de jure* vestry, duly incorporated, or merely a *de facto* vestry, *constituted* by the Convention of the Diocese of Maryland, and who have to look to the civil law to make them a body politic? The question properly arises in this case, because if they are a voluntary association, only *constituted* and recognized by the religious organization to which they belong, they are absolutely bound by the laws, canons, customs, usages and discipline of that body, and can lay claim to no powers which by the civil law are granted to a duly incorporated body. The question, therefore, properly arising in this case (though not essential to the contention of the appellee), it is important that it shall be determined.

All parishes had been established by the civil law in this State under the Acts of 1692 and 1702 of the Provincial Assembly, and all changes therein had been made by the same authority until the Vestry Act of 1798, under the 33d section of which the complainants claim to be incorporated; the Convention of the Diocese of Maryland, was a voluntary association originating in 1783, and which was never even incorporated until the year 1840, by Act of Assembly of that year, ch. 67, amended in 1856, ch. 17, and again in 1878, ch. 403, and this was only for the purposes therein set out as to holding and managing property and money. The Act of 1802, ch. 111, was the first general law for the incorporation of religious bodies; this Act in its 10th section grants to persons desiring to separate from the Church or congregation to which they belong and establish a separate place of worship and employ a minister for themselves, the right to do so on certain terms, and they

shall then be entitled to all the benefits of that Act, anything in the Act of 1798 to the contrary notwithstanding; it also, by section 11, repeals so much of the Act of 1798, as gives to the church wardens the powers of civil officers of the place, and in section 12 reaffirms the Act of 1798, except as altered by these sections 10 and 11. The general incorporation law, 1868, ch. 471, embodies the provisions of the Act of 1802, and in its 169th section has a saving clause reserving to the Protestant Episcopal Church the right to incorporate vestries in its several parishes according to the usages of said Church; and this saving clause is also embodied in the Code of 1888, Art. 23, sec. 217. Did the Legislature intend by the 33d section of the Vestry Act that the election of a vestry, when the Convention had *constituted a parish* by metes and bounds, should *ipso facto* work the incorporation of that vestry? or do the words in that section "and be incorporated by the name of the vestry of such new parish" imply that such vestry must take such further step of incorporating itself as incorporations were then effected by the Act of the Legislature, or since the Act of 1802, ch. 111, as that Act provides? If this vestry ought to have incorporated under that Act they have failed to comply with its terms and are not incorporated. *Boyce vs. Trustees of the Towsontown Station of the M. E. Church,* 46 *Md.,* 359.

If the Act of 1798, ch. 24, is supposed *ipso facto* to incorporate the vestry, there is no provision for any public record of such final action. In the matter of the holding or transfer of property it would introduce an element of great uncertainty as to title, and should such a corporation be sued, it would render the proving of its corporate existence almost impossible. *Boyce vs. Trustees of the Towsontown Station of the M. E. Church, supra.* See *McKim vs. Odom,* 3 *Bland,* 416.

ROBINSON, J., delivered the opinion of the Court.

The question in this case is an interesting one, and one too of more than ordinary importance. The plaintiff is a clergyman of the Protestant Episcopal Church, and the defendants are vestrymen of Saint Matthew's parish, in Garrett County. After some correspondence between the plaintiff and the defendants, and the Bishop of the diocese, in regard to filling a vacancy then existing in the rectorship of the parish, the defendants on the 3d December, 1887, passed the following resolution: "That in consideration of the letter received from the Bishop, the Rev. F. S. Hipkins is hereby called to the rectorship of St. Matthew's parish, Oakland, Md., also that the vestry pledge to the Rev. F. S. Hipkins the sum of seven hundred dollars a year, independent of what he may receive from the mission fund."

This call, with the terms and conditions on which it was offered, was accepted by the plaintiff, and he at once entered upon the discharge of his duties as rector. Subsequently, on the 13th of September, 1890, the vestry by resolution requested the plaintiff to resign his rectorship, the said resignation to take effect January 1st, 1891. This however he refused to do, and the vestry by resolution passed 15th of November, 1890, notified him that his rectorship of the parish would terminate 1st of January next ensuing. From this action of the vestry the plaintiff appealed to the Bishop of the diocese, claiming under Title II, Canon 4, of the Protestant Episcopal Church of the United States, that the vestry had no power to terminate his pastoral relations against his consent. This canon provides, that in case of any disagreement between a rector and the vestry in regard to the dissolution of his pastoral relations, either party may give notice of such disagreement to the Bishop, and that the decision of the Bishop in the premises shall be final and binding upon the parties. Section 4, how-

2                                   v. 76.

ever, provides, that "this canon shall not be in force in any diocese which has made, or shall hereafter make, provision by canon upon the subject, nor in any diocese with whose laws or charters it may interfere." In every diocese, therefore, in which this canon is in force, the termination of the pastoral relations of the rector must, it is clear, be governed by its provisions. On the other hand, if any diocese has adopted a canon of its own in regard to the subject-matter, or if the general canon law interferes with the State law, then the general canon law has no application or force in such diocese or State. No canon, it is conceded, has been adopted in this diocese upon the subject-matter, and the question, then, is whether there is any State law inconsistent with the provisions of the general canon law, for, if so, the canon is not, it must be conceded, in force in this State. Now the Act of 1798, chapter 24, incorporating the vestries of the Protestant Episcopal Church, and vesting in them the title and possession of all lands and property belonging to the church, provides (section 15) that "the vestry of every parish shall have full power and authority, from time to time, to choose one or more ministers or readers of the Protestant Episcopal Church, (heretofore called the Church of England), to officiate in any church or chapel belonging to the parish, and to perform the other duties of a minister therein, for *such time* as the said vestry may think proper, and *they may* agree, and *contract* with such minister or ministers, reader or readers, for his or their salary, and respecting the use and occupation of the parsonage-house, or any glebe or other lands, or other property, if any, belonging to the parish, and on such terms and conditions as they may think reasonable and proper, and their choice and contract shall be entered among their proceedings; and upon the expiration of such contract, the said vestry may, in their discretion, renew their choice, or make a new contract; but if they do not

incline so to do, their former choice and contract shall remain, until they declare their desire to make a new choice or contract." This Act was in force at the time the plaintiff accepted the call tendered to him by the vestry, and when he entered upon the discharge of his duties as rector. By this Act the vestry was not only authorized to "choose" or appoint a minister, but his tenure and the termination of his pastoral relations were made the subject-matter of contract between the vestry and himself, provisions altogether inconsistent with the canon law, and, being inconsistent, we do not see on what grounds that law can be considered as being in force in this State. The Bishop, however, decided that the canon law was applicable in this particular case, because the vestry failed to comply with the conditions of the civil law; and this being so, he decided also that the vestry had no power, either under the civil or ecclesiastical law, to terminate the pastoral relations of the plaintiff. Now, if it be conceded, for the purposes of this case, that the vestry had failed to comply with the requirements of the civil law, the Act of 1798 still being in force, we do not see, with great deference, how its failure in this respect could make operative a canon not in force in this State. But, be that as it may, whether the resolution of the 3rd of December, in pursuance of which the plaintiff accepted the rectorship of this parish, be a compliance with the Act of 1798, depends upon the terms of the resolution, as construed in the light of the facts and circumstances under which it was passed, and the law as it then existed in reference to the subject-matter. And in considering these it will be necessary to refer briefly to certain facts connected with the Colonial history of the Church which led to the passage of that Act by which the vestries in this State were authorized to employ ministers, and to contract with them in regard to the tenure of their office. By

the Act of 1702, ch. 1, the Church of England, with its Rites, Ceremonies and Sacraments, was declared to be the established Church of the Province; and by it provision was made for the support of its ministers by an annual levy "of forty pounds of tobacco per poll upon every taxable person" within each respective parish. How far and to what extent, the Church thus established, was subject to the English Ecclesiastical law has given rise to a good deal of discussion, and about which there is some conflict of opinion. It may be fairly assumed, however, that the Colonial Church was subject to and governed by this law so far as it was applicable and was consistent with the chartered rights of Lord Baltimore. The Bishop of London, as Bishop Ordinary, not only claimed, but exercised so far as was practicable, ecclesiastical jurisdiction; but the distance and want of communication with the Mother Country and other causes rendered the exercise of this jurisdiction almost powerless. But in the *Presentation, Appointment* and *Induction* of clergymen the Colonial Church was not governed, it is clear, by the ecclesiastical law. In England the Presentation was made by the patron, the founder of the parish, having the right of advowson, or by his heir or alienee; and when presented if there was no objection to him, he was instituted by the Bishop, that is, put in the care of the souls of the parish. Then followed Induction by the mandate of the Bishop, being a ceremonial act performed by the inductor, the Archdeacon; such as the delivery to the incumbent of the key of the church door, and then the tolling of the bell, or other like ceremony, being a symbolical delivery to him of the possession of the church, and all the property belonging to the parish, including tithes, &c. And when once inducted, he thereby acquired a freehold interest in the property of the parish of which he could not be deprived except by ecclesiastical sentence. Here, however, the

Bartlett, *et al. vs.* Hipkins.

appointment was made by Lord Baltimore as the owner of all the livings and entitled therefore to the right of advowson, and when so appointed the minister was licensed by the Bishop of London, and he was then inducted by the Governor. And, though there does not appear to have been any ceremony accompanying the act of Induction, the same legal effect followed it as in England. At least no clergyman once inducted, was ever deprived of his benefice during the Colonial period, for although subject to the jurisdiction of the Bishop of London, yet such were the difficulties attending its exercise that all efforts on his part, or by his commissary to bring offending clergymen to trial and punishment proved unavailing. And, referring to this subject, the Rev. Dr. Hawks says: "Thus Lord Baltimore selected a clergyman in England and appointed him to a living; the Bishop of London gave him a license; the Governor inducted him; if he did wrong, the commissary tried him, if there happened to be a commissary; and when convicted, no power punished him; for after induction even his Lordship, the Proprietor, could not remove him; and the Bishop of London, his Diocesan, could neither give nor take away the meanest living." *Hawks' Ecc. Con.,* 194. This condition of things produced its legitimate fruits, and the persistent but unsuccessful efforts on the part of the vestry to dissolve the pastoral relation, when such dissolution seemed so desirable, forms a painful chapter in the Colonial history of the Church, the details of which we have no inclination to consider. And this continued down to the American Revolution, when Maryland, having formed a Constitution for its own government, put an end forever to the Establishment. But the troubles of the Church did not cease with its disestablishment. Many of its clergy remained loyal to the Mother Country, and before the Revolution was over, a majority of the parishes were left without a

rector.   The proprietary rights of Lord Baltimore being annulled by the Revolution, he no longer had the power of appointment; and the Bishop of London, if his jurisdiction still continued, no longer attempted to exercise it, and if he had, such was the temper of the times, it is doubtful whether his authority would have been respected.   There was no Bishop in the State, and strange to say, there never was a Bishop of the Protestant Episcopal Church in this country until after the Revolution, Bishop Seabury of Connecticut, consecrated in 1784, being the first American Bishop.   So practically speaking there was no law, civil or ecclesiastical, for the government of the Church, and it was therefore absolutely necessary to provide by law some mode for the appointment of ministers to fill, not only the vacancies then existing, but such as might occur in the future.   And hence the Act of 1779, ch. 9, providing for the election of a vestry in every parish, in whom, when elected, was vested the title to all churches, chapels and property belonging to the parish; and this Act further provided "that the said vestrymen or a major part of them shall have full power and authority to employ a minister of the Church of England, to officiate in their respective churches or chapels for such time as may be agreed upon."   We have thus briefly traced the causes which led to the passage of this Act.   The laity had felt the mischiefs resulting from the appointment of ministers by patrons and strangers, and they had experienced, too, the difficulties in dissolving the pastoral relation when once established, however. much the best interests of the parish might require such a dissolution.   And to remedy all this the power to select or "choose" a minister—for such is the language of the Act—was conferred upon the vestry, and his tenure was made a matter of contract between himself and the vestry.   This Act remained in force until the Act of 1798, ch. 24, in which

was embodied the same provision in regard to the selection of a minister and his tenure when so selected, the word "choose" being substituted for "employ" used in the Act of 1779; and with this further significant and important modification, that if, upon the termination of his tenure as fixed by the contract, the vestry failed "to make *a new choice or contract,*" the minister was still to continue in his rectorship, until the vestry deemed it advisable to "make a new choice or contract."

This Act was in full force when the defendants tendered the rectorship of this parish to the plaintiff and when it was accepted by him, and Canon 4 being inconsistent with its provisions, it necessarily follows that the dissolution of the plaintiff's pastoral relations must be governed by and determined by the Act. The contention, however, and it is the sole contention, of the plaintiff, is that the general canon law must be considered operative, in this particular case at least, because the defendants by the resolution of December 3rd, by which the plaintiff was called to the rectorship of the parish, failed to comply with the conditions of the Act of 1798. Without conceding for a moment that the failure of the defendants in this respect, could make operative a canon law otherwise conceded not to be in force in this State, let us see whether it can be fairly said that they have failed to comply with the conditions of the law. Here was a vacancy in the parish, and after some correspondence with the Bishop the vestry offered to delegate to him its authority to call a minister. But this offer he declined, because he had some doubts whether he could lawfully exercise delegated power, and, further, because he did not believe the plaintiff would accept the appointment unless he thereby had the full authority of a rector. Then, by the resolution of 3rd December, the defendants tendered to the plaintiff the rectorship of the parish, agreeing at the same time to pay him seven

hundred dollars a year. This call, and the terms upon which it was offered, were accepted. Here, then, is a case in which the plaintiff was chosen rector by the vestry, and in consideration of his services as such, an agreement on its part to pay to him a stipulated sum of money a year, and this call and agreement were both recorded among its proceedings. What more does the Act of 1798 require? But it is said the resolution of the 3rd of December, fails to comply with the conditions of the Act, because it does not fix a definite time for which the plaintiff was chosen rector; that it does not fix a day for the termination of his pastoral relation. This is a question of law, to be determined by the terms of the contract itself, and the nature and character of the services to be rendered under it. The plaintiff knew, or in law is presumed to have known, that the vestry in tendering to him the rectorship of the parish was acting in pursuance of the authority conferred on it by the Act of 1798. This we say because there was no other law, civil or canonical, in force in this State conferring upon a vestry the power to call a minister, and to contract with him in regard to his tenure as minister. And for the purposes of this case it is altogether immaterial whether the resolution of 3rd December be construed as a contract for a definite, or an indefinite time. It is immaterial because, if it be construed as a contract for a definite time—for a year,—then the plaintiff's rectorship terminated at the end of that year. On the other hand, if it be construed as a contract for an indefinite time, then it is a contract at will, terminable any time at the will of either party. So in any aspect in which this resolution under which the plaintiff assumed his rectorship may be considered, it is, it seems to us, not only a substantial but a literal compliance with the terms and conditions of the Act. If it be construed as a yearly contract, a contract for a year, then the defen-

dants had the right, beyond question, to terminate the plaintiff's pastoral relations on the 1st of January, 1891, or, if it be construed as a contract at will, they had the right to terminate it at any time they might deem it proper.

Now, as to the doubt suggested in regard to the incorporation of the vestry of this parish it is sufficient to say the Act of 1798, declared, in the first place, every vestry elected in pursuance of the provisions of that Act to be a *corporate body;* and then it further provided that the Convention of the Protestant Episcopal Church in this Diocese may from time to time constitute new parishes, by dividing or uniting the several parishes then existing, and the vestries of such parishes elected in pursuance of the Act are thereby declared to be incorporated. So all that is necessary to incorporate a vestry under this Act, is that the Convention of the Diocese shall in the first place constitute the parish, and then that the parishioners shall elect a vestry, and when these conditions are complied with the vestry *ipso facto* becomes a corporate body. And such has been the practice and usage of the Protestant Episcopal Church in the formation of parishes, and the incorporation of vestries ever since the Act of 1798, was passed. And the general corporation law, Art. 23, sec. 217, provides in express terms, that "nothing in this Article shall prevent the Protestant Episcopal Church from incorporating the vestries in the several parishes according to the usages of the said church."

The Act of 1798 is not to be found, it is true, in the Code. But the Code is a codification of the Public General Laws, and the Public Local Laws. This Act, is neither a Public General Law nor is it a Public Local Law. It is a mere *private* Act incorporating the vestries of a particular Religious denomination, *private corporations,* and being a private law it was not and could not

properly be codified as part of the Public General Laws. It follows from what we have said that the order granting an injunction in this case must be reversed, and that the bill filed by the plaintiff must be dismissed.

*Order reversed, and*
*bill dismissed.*

(Decided 8th April, 1892.)


On the 23rd of April, 1892, a motion was made by the appellee for the rehearing of the foregoing case, but the motion was overruled.

ALVEY, C. J., filed the following opinion:

I fully concur in the conclusion reached by my brother Judges who heard this case, that the order appealed from should be reversed. But as I do not agree to all the propositions stated as the basis of that conclusion, and as the case is one of great delicacy and importance, affecting a large portion of the people of the State, I deem it proper that I should express my own views in regard to the questions involved, and the grounds upon which I think the order of the Court below should be reversed.

This is an unfortunate church controversy, originating between vestry and rector in the parish of Saint Matthew, in Garrett County,—one of the parishes of the Protestant Episcopal Church of the United States, in and for the diocese of Maryland, duly established, and subject to the diocesan jurisdiction of the Bishop of Maryland, according to the Constitution and Canons of that Church. And while the controversy originated between a vestry and rector, it has now become to be a question of the extent of the power and jurisdiction of the Bishop of the diocese, under a Canon of the Church, to control the action of the vestry, in respect to their rela-

tions and obligations to the rector, *in proper subordination to the law of the State.*

There is no question here of faith, spiritual discipline, or mere rule of ecclesiastical government apart from relations created by contract, and the property rights of the parish. The principal matter of this suit depends upon the contractual relations existing between the vestry and the rector, construed with reference to statutory provisions of the State. And such being the case, it is quite true, as said by the Supreme Court of the United States, in *Watson vs. Jones*, 13 *Wall.*, 679, 714, that religious organizations come before the Courts of the country in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints. It is in respect to these rights, and no other, that this case is brought into this Court by the appellants.

The bill was filed in the Court below by the rector, the Rev. Mr. Hipkins, against the vestry of St. Matthew's Parish, alleging that the defendants were the vestry of the parish, and that they had undertaken to remove him from his position of rector of the parish, and to deprive him of his civil and ecclesiastical rights in the premises, "in violation of the Canons of the Church, enacted for the determination and settlement of disputes arising between the rectors of the several parishes and their vestries or congregations;" and he thereupon prayed an injunction to restrain the vestry from offering obstructions to and preventing him from officiating in his clerical character in the parish church, under and by virtue of what he alleges to have been a regular call and engagement of him by the vestry for that purpose. The injunction was granted, and the plaintiff continued to hold his position of rector, with

all the rights and privileges appertaining thereto, notwithstanding the decided opposition and earnest protest of the vestry.

The parish of St. Matthew, in Garrett County, was duly constituted by the Convention of the Protestant Episcopal Church in the diocese of Maryland, in 1874; and in the same year vestrymen of the parish were elected, and they took action for their organization and incorporation under and, as they supposed, in pursuance of the provisions of the Vestry Act of 1798, ch. 24, entitled "An Act for the Establishment of Vestries for each Parish in this State." This Act was made applicable exclusively to the Protestant Episcopal Church of this State, formerly denominated the Church of England.

It appears that the vestry, in 1887, were desirous of having the parish church supplied with a minister; and, upon correspondence with the Bishop of the diocese, and upon his suggestion, they, by resolution of the 3rd of December, 1887, called to the rectorship of the parish the plaintiff, and pledged to him the sum of $700 a year, independent of what he might receive from the mission fund. This call, upon the terms proposed, was accepted by the plaintiff, and he entered upon his parochial duties; but in the third year of his service difficulties between himself and the vestry arose, and the latter, by resolution of the 13th of September, 1890, requested the plaintiff to resign his rectorship of the parish, the resignation to take effect from the 1st of January, 1891. But the plaintiff refused to resign; and thereupon the vestry, by resolution of the 15th of November, 1890, declared, and notified the plaintiff of the fact, that they would consider his services as rector of the parish as terminating on January 1st, 1891. Against this action of the vestry the plaintiff protested, and denied the right of the vestry to remove him; and by letter he invoked the interposition of the Bishop of the diocese, by

way of appeal, for his decision in the premises, under Canon 4, Title II, of the General Convention of the Protestant Episcopal Church of the United States, relating to differences between ministers and their congregations, and to the dissolution of pastoral connection. The vestry were cited to appear before the Bishop and the Standing Committee of the diocese on this appeal. But to this citation the vestry made no other answer than to deny and protest against the authority and jurisdiction of the Bishop in the premises, and to assert their right and power, under the law of the State, to dissolve the pastoral relation between the rector and the parish. This exception, however, to the jurisdiction of the Bishop, was overruled by him, with the advice of the Standing Committee; and he thereupon declared "that the case was properly before him as coming under the Canon, the *vestry having failed to comply with the conditions of the civil law.*" And he thereupon adjudged and declared, with the unanimous advice and consent of the Standing Committee, "that said action by the vestry aforesaid, *was beyond their power under either civil or ecclesiastical law,* and did not and would not work a dissolution of pastoral connection."

The vestry, disregarding the judgment of the Bishop, and relying upon the supposed right and authority vested in them by the law of the State, proceeded to close the church against the plaintiff, who claimed to be the rightful rector of the parish, and thereby prevented him from performing ministerial functions in the parish church. It was in this condition of affairs that the plaintiff filed his bill to obtain an injunction against the vestry. He charges in his bill that the vestry hold the property of the church in trust for the uses and purposes of the congregation of St. Matthew's Parish, to be governed by the canon law of the Protestant Episcopal Church in Maryland, and for no other uses or purposes whatsoever.

And upon the statement of the facts to which I have referred, he alleges that he is entitled, by virtue of his relation as rector, to an injunction against the vestry, *perpetually enjoining them* from interfering in any way or manner with him, the plaintiff, in the exercise of the functions of his office and possessory rights as rector of the parish, *before a regular and canonical dissolution of the connection now existing between him and the congregation of said parish, shall have taken place, in accordance with the constitution and canons* of the Protestant Episcopal Church. A copy of the canon relied on as conferring rights upon the plaintiff, and jurisdiction upon the Bishop of the diocese, is made an exhibit with the bill, and its correctness is admitted by the defendants.

It is thus apparent that, according to the theory upon which the plaintiff founds his claim and pretension, as also the ground upon which the learned Bishop proceeded, the canon of the General Convention of the Church is regarded as furnishing the law that controls the relation of vestry and rector. And whether this be so or not, is really the principal question of the case.

The defendants in their answer admit the call and employment of the plaintiff, and the fact that they had removed him from the rectorship of the parish, and refused to renew the contract with him; which, they insist, they had full authority for doing by the terms of the statute law of the State. They also admit the fact of the appeal to the Bishop by the plaintiff, under the canon, and that the decision of the Bishop was adverse to the right and contention of the defendants; but they insist that such decision was without warrant of law, and therefore wholly without binding effect. They aver and insist that the pastoral relation between the plaintiff and the parish was rightfully and completely dissolved and terminated on the 1st of January, 1891, by the resolution of the vestry of the 15th of November,

Bartlett, *et al. vs.* Hipkins.

1890; and they plead and set forth the particular sections and provisions of the Vestry Act of 1798, ch. 24, as fully justifying their action in the premises.

Before, however, proceeding to consider the principal question raised upon the pleadings, it is necessary to determine the question whether the parish of St. Matthew in Garrett County was lawfully constituted; and the further question, raised by the plaintiff, whether the defendants, as the vestry of that parish, have been lawfully incorporated? These questions depend upon another question, and that is, whether the Vestry Act of 1798, ch. 24, was in force in 1874, under which the parish was designed to be constituted, and the vestry incorporated, in that year.

These preliminary questions lie at the base of the case; for if the parish was not legally constituted, or the defendants not legally incorporated, the latter were without authority, as a lawful vestry, to call the plaintiff and place him in charge of what was supposed to be, but what in law was not, a legally defined parish. Nor should the defendants have been proceeded against in this case in their merely supposed corporate capacity of vestry. The whole case would be groundless if there were not a legally constituted parish, and an incorporated vestry thereof.

In considering these preliminary questions, it is pertinent to advert briefly to the former *status* of this church in the Colony, and subsequently in the State, and to the special legislation had in relation thereto.

It is matter of familiar history, that near the end of the seventeenth century, and immediately upon the close of what is historically known as the Protestant Revolution, and the assumption of regal control, in the Colony of Maryland, this Church, then known as the Church of England, became established by law. This was first accomplished by the Act of the Colonial Assembly of

1692, ch. 2, being entitled "An Act for the service of Almighty God, and the *Establishment of the Protestant religion* in this province." By this Act provision was made for dividing all the counties into parishes, and for the election of vestrymen for each parish, for the conservation of all church rights and interests; and by the same Act, a poll tax of forty pounds of tobacco was imposed upon every taxable of the province, to build churches and sustain their ministers. This was succeeded by further legislation in support of the Establishment, down to the Act of 1702, ch. 1, entitled "An Act for the establishment of religious worship in this province, according to the Church of England, and for the maintenance of ministers." *McMahon, Hist. of Md.,* 243, 244. It was upon this latter Act that the established Church of England in the Colony principally rested, down to the period of the American revolution. It was then effectually disestablished; though the parishes previously laid off were maintained intact; and by Art. 33 of the Declaration of Rights of 1776, it was declared, that "the churches, chapels, glebes, and all other property then belonging to the Church of England, ought to remain to the Church of England forever." And following this disestablishment of the church was the Act of 1779, ch. 9, entitled "An Act for the establishment of select vestries," in whom was vested the estate in fee in all glebe-lands, churches, chapels, and the lands belonging thereto, then late the property of the people professing the religion of the Church of England. And by another section of that Act, the vestry, or a majority of them, were expressly clothed with *full power and authority* to employ a minister of the Church of England, to officiate in their respective churches or chapels, *for such time as might be agreed upon.* This, however, it must be borne in mind, was before any diocesan jurisdiction had been established

in the State,—the first Bishop of the diocese not having been elected until 1792.

But the Act of 1779, ch. 9, was repealed by the Act of 1798, ch. 24, which was an Act for the establishment of vestries for each parish in this State, and which has been subsequently known as the general Vestry Act of the Protestant Episcopal Church. In this Act was reproduced many of the provisions, with modifications, of the old Act of 1702, ch. 1, and some of the provisions of the Act of 1779, ch. 9. It provides for the election of vestries, church-wardens, and registers, and prescribes their respective powers and duties. It provides that the vestry of each parish, for the time being, shall have an estate in fee simple in all churches, chapels, glebes and other lands, belonging to the church, and that it shall be lawful for such vestry so to manage and direct all such property as they may think most advantageous to the interest of the parishioners, and they shall have the property in all books, plate, &c. belonging to said church. And by section 28 of the Act, it is provided that the vestrymen of every parish in this State, for the time being, *shall be, and they are hereby declared to be, one community, corporation and body politic, forever,* by the name of the vestry of the parish to which they severally belong, and by the same name they, and their successors, shall and may have perpetual succession, with powers, &c. This statute, by its own terms, creates and declares the corporate existence of the vestry upon due election, as by preceding sections is provided. And by section 33 of the Act, it is provided that it shall be lawful for the Convention of the Protestant Episcopal Church in this State to divide or unite parishes, as occasion may require, *and to alter their bounds, and to constitute new parishes;* and that vestrymen and church-wardens of such new parishes shall be chosen as by preceding sections is directed. It was by virtue of the author-

ity thus given that the parish of St. Matthew was divided from an elder parish, and constituted a separate parish, by the Convention of the Church in 1874.

The question whether this Act of 1798, chap. 24, and its supplements, are still in force, has arisen solely from the manner in which the Act has been treated by the codifiers of our statute law. From the Code of 1860, and also that of 1888, though professing to embrace all the Public General Laws of the State, this important Act of 1798, ch. 24, has been omitted. In adopting each of these Codes of the Public General and Public Local Laws of the State, the Legislature enacted that they "should supersede and stand in the place of all public laws of this State whatsoever." Among the public general laws we find codified the later Act, that of 1802, ch. 111, for the incorporation of certain persons in every Christian Church or congregation in this State; but that statute was no substitute for the Vestry Act of 1798, ch. 24. On the contrary, the Act of 1802 expressly provided, in section twelve, that the latter Act should not repeal any part of the Act for the Establishment of Vestries, except in two minor particulars specially mentioned. The manner of incorporation of vestries, and the establishment and government of parishes, as provided in the Act of 1798, are quite different from the manner of incorporation, and the exercise of rights and duties of religious corporations, as prescribed by the Act of 1802. The Act of 1798, ch. 24, had always, prior to the adoption of the Code of 1860, been regarded and treated as one of the public statutes of the State; and hence, in the compilation of "The General Public Statutory Law of the State," by the late Judge CLEMENT DORSEY, published in 1840, by the patronage and under the approval of the Legislature of the State, the Act of 1798, ch. 24, and all its supplements, were incorporated. From the importance of the Act, and its general his-

tory, it is not fair or reasonable to suppose that its omission from the Code was intended, either by the Legislature or the codifiers, to operate as a repeal of the Act. It has not been so treated or regarded by the people of the State, nor the church for whose temporal organization and government it was enacted. Vestries are being constantly incorporated under that statute; and in the compilation of the canons and laws of the church of this diocese, published by order of the Convention so late as 1889, this Act of 1798 is published as the statute of the State under which parishes may be established and vestries incorporated. The only provision found in either the Code of 1860 or that of 1888, whereby the vestries of the Protestant Episcopal Church are specially recognized as being entitled to incorporation, is section 101 of Art. 26 of Code of 1860, and section 217 of Art. 23 of Code of 1888. In these sections it is declared that nothing in the Article, title, "Corporations," "*shall prevent* the Protestant Episcopal Church from incorporating the vestries in the several parishes, *according to the usages of the said church.*" The terms of this saving to the Church were certainly not well or aptly chosen, for it had not been according to any mere *usage* of the Church, but, as we have seen, by virtue of express provisions of positive statute law, that the vestries of that Church had, and have been, uniformly created and incorporated. It is, however, more than probable, indeed, it is the only solution of the question, that, as the Act of 1798, ch. 24, had relation to one Church or denomination only, it was regarded by the original codifiers of 1860, as being in the nature of a statute of special or limited application, neither properly embraced in the class of public *general* laws, nor in that of public local laws, into which the Code was divided, and therefore it was omitted from the codification; and that the short section we find in the Code in reference

to the subject, was simply inserted to prevent the inference that the Vestry Act of 1798 was intended to be repealed.

I cannot, however, agree that the Act of 1798, ch. 24, is a mere *private* Act, in any proper sense of the term, as would seem to be supposed by a majority of the Court. It was intended to protect and promote religion, which is certainly a matter of public concern. Besides, the Act itself is of a nature to require all the Courts and people of the State to take notice of it, without being specially pleaded. It prescribes fines and penalties, to be recovered by public prosecutions; and it makes certain instruments valid evidence that are required to be received by all the Courts of the State in any action pending therein. It is laid down as a general well settled principle, that if an Act affects in any way public interests, it will be held to be a public statute, and the Act in question certainly does affect an important public interest. *Sedgw. on St. & Const. Law, p.* 33. The several vestries organized under the Act are, doubtless, private corporations; but this general Act under which they derive their corporate existence and powers, is clearly, in my opinion, a public statute. 4 *G. & J.* 408. *Blackstone,* in vol. I of his *Commentaries,* p. 86, states the distinction between public and private Acts with great clearness. Thus, he says, "to show the distinction, the Statute 13 Eliz., c. 10, to prevent spiritual persons from making leases for longer terms than twenty-one years, or their lives, is a public Act; it being a rule prescribed to the whole body of spiritual persons in the nation: but an Act to enable the Bishop of Chester to make a lease to A. B. for sixty years is an exception to this rule; it concerns only the parties and the bishop's successors; and is therefore a private Act." See also *Unity vs. Burrage,* 103 *U. S.,* 447, 454. And so here, the statute prescribes rules and regulations for the temporal organiza-

tion of the whole Church, and the entire body of its adherents, within the State; and that, though such adherents might constitute the larger portion of the State's population.

It being clear that the Act of 1798, ch. 24, is still in force, notwithstanding its omission from the Code, and that the parish of St. Matthew was legally constituted under the Act, and that the vestry of the parish was duly incorporated, we may recur to the main question, and that is, what were the rights and powers of the vestry in terminating the pastoral relation of the plaintiff with the parish which they represented?

Section 15 of the Vestry Act of 1798, ch. 24, is explicit upon this subject. It provides that the vestry of every parish shall have power and authority, from time to time, to choose a minister (by sec. 16 to be called the rector) to officiate in the parish church, *for such time as the said vestry may think proper*, and they may agree and contract with such minister for his salary, and respecting the use and occupation of the parsonage-house, and other property, if any, belonging to the parish, and on such terms and conditions as they may think reasonable and proper, and their choice and contract shall be entered among their proceedings. And the section then proceeds to provide, that "*upon the expiration of such contract, the said vestry may, in their discretion, renew their choice, or make a new contract, but if they do not incline so to do, their former choice and contract shall remain until they declare their desire to make a new choice or contract.*"

Now, the canon relied on, and under which the plaintiff proceeded on his appeal to the Bishop of the diocese, (Canon 4, sec. 1, Title II,) provides, that "A rector canonically elected and in charge, or an instituted minister, may not resign his parish without consent of the said parish or its vestry (if the vestry be authorized to

act in the premises); nor may such rector or minister *be removed therefrom by said parish or vestry against his will*, except as hereinafter provided.'' And the canon then makes provision for an appeal to the ecclesiastical authority of the diocese, which, as it is declared, ''shall be the ultimate arbiter and judge;'' and if the decision be against the parish and in favor of the rector, and the former refuse to comply with the decision and judgment, the punishment is, that the parish shall be disqualified ''from representation in the Convention of the diocese until it shall have been declared by the ecclesiastical authority to have given satisfactory guaranties for the acceptance of and compliance with the arbitration and judgment.''

It certainly requires no critical analysis of the terms of either the statute or the canon to show that there is an irreconcilable conflict between the two. Both cannot consistently apply to and govern the same state of case. One must be supreme and controlling; and that one is, upon the clearest principle, the law of the State, as being of superior force and obligation to the canon. No authority of the General Church Convention could control the authority of the State.

The temporal relation of the rector to the parish, with the civil rights and incidents pertaining thereto, is not here, as in England, established by the ceremonies of Institution and Induction, with their attendant legal effects, according to the English law, but is simply created and made dependent upon contract or employment, and is controlled by the law of the State, and not by any canon of the Church. Indeed, the question of the effect of the State's statutes, and their operation as paramount law, was duly considered, and the conflict provided for, by the able and learned members of the General Convention of the Church who framed and subsequently modified Canon 4 of Title II; and they have,

Bartlett, *et al. vs.* Hipkins.

by section 4 of that canon, expressly declared, that "This canon *shall not be in force* in any diocese which *has made, or shall hereafter make,* provision by canon upon this subject, *nor in any diocese with whose laws or charters it may interfere.*"

The canon in question, therefore, was not intended to be enforced in this State, nor in any other State, where there was statute law with which the canon would conflict. Hence, in the Book of Common Prayer of the Church, we find under the title of "Institution of Ministers into Parishes or Churches," there is a special direction given for the *omission* of that paragraph in the formula of the Bishop's Letter of Institution, which has reference to the temporalities appertaining to the cure, and to the manner of separation or dissolution of the pastoral relation, in those States where there are laws with which the canon would interfere. It is clear, therefore, that this Canon 4, of Tit. II, cannot be invoked by the plaintiff in support of the judgment of the learned Bishop of the diocese, vacating and setting aside the resolution of the vestry dissolving pastoral relations with the plaintiff.

The contractual relation of the plaintiff with the vestry was not analogous to that created by an ordinary hiring for service. It was a professional employment of a special character authorized by the statute; and the question is, construing the contract with reference to the provisions of the statute, what was the nature or limit of the contract, as to time, which was entered into between the vestry and the plaintiff? Taking the terms of the statute altogether, it would seem to be plain, that while the vestry may employ a minister for a time determinable at will, or for a definite time, which may be continued after the expiration of the term by renewal of the contract or otherwise, at their discretion, *no indefeasible, indeterminate contract, as to time, is contemplated*

*by the statute.* The power of employment is given, in the language of the statute, "for such time as the vestry may think proper;" and upon the *expiration* of such contract, the vestry may renew the old or make a new contract, or allow the former contract to remain in force *until* they may think proper to make a new contract or a new choice of a minister. Here, if it be held that the original employment was, by implication, for a year; or, if not for a year, that it was at will, the compensation to be at the rate of $700 per annum; in either case, the vestry had the clear right to terminate the contract, and, by so doing, terminate the pastoral relation of the plaintiff with the parish.

But while the vestry may have such right to terminate the contract with the rector, the right must always be exercised with due regard to the principles of justice, depending upon the circumstances of the case. Reasonable notice is essential; but in this case such notice was given, and I do not understand that there is any complaint of the want of reasonable notice.

Upon the whole case, and upon careful consideration of the reasons assigned in support of the motion for re-argument, I am clearly of opinion that there is no ground whatever shown for an injunction, and that the bill should be dismissed.

(Filed 14th June, 1892.)